(C.D. 2234)

Madison Import Corp. v. United States

United States Customs Court, Second Division

(Decided January 24, 1961)

*Stein & Shostak* (*Marjorie M. Shostak* and *S. Richard Shostak* of counsel) for the plaintiff.

*George S. Leonard*, Acting Assistant Attorney General (*Murray Sklaroff* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Lawrence, Judge: An importation of merchandise described on the consular invoice as "Starter Revolvers RG–8 blued with white grip plates" was classified by the collector of customs as revolvers, which are enumerated in paragraph 366 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 366) and dutiable at the rate of $2 each and 55 per centum ad valorem.

Plaintiff claims that the merchandise should properly be classified as machines, not specially provided for, in paragraph 372 of said act (19 U.S.C. § 1001, par. 372), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and assessed with duty at the rate of 13¾ per centum ad valorem.

The pertinent text of the statutes above cited is here set forth—

Paragraph 366 of the Tariff Act of 1930, *supra*:

Pistols and revolvers: Automatic, single-shot, magazine, or revolving, valued at not more than $4 each, $2 each; valued at more than $4 and not more than $8 each, $2.50 each; valued at more than $8 each, $3.50 each; parts thereof and fittings therefor, 50 per centum ad valorem; and in addition thereto, on all the foregoing, 55 per centum ad valorem.

Paragraph 372, as modified, *supra*:

Machines, finished or unfinished, not specially provided for:

Calculating machines specially constructed for multiplying and dividing _____ * * *

| * | * | * | * | * | * | * |

Other * * *_____ 13¾% ad valorem.

The sole question presented to the court is whether the so-called starter pistols are properly classifiable within the provision for pistols and revolvers in said paragraph 366, *supra*, or as machines, not specially provided for, in paragraph 372, as modified, *supra*.

At the trial, two witnesses gave testimony, one of whom was called by the plaintiff and the other in behalf of the defendant.

Plaintiff's witness, George W. Rose, testified substantially as follows: For approximately 10 years, he had been engaged in business under the name of the Madison Import Corp., importing general merchandise and guns. He identified the imported articles as starter pistols or revolvers, a sample of which, together with a brush, was received in evidence as plaintiff's collective exhibit 1. The witness Rose described the merchandise as follows—"It is to start games and to—for magic purposes, magicians' purposes, theatrical purposes." He explained that a blank cartridge is used in this pistol, the type of cartridge illustrated by the contents of exhibit 2—a round metal box, bearing a label which indicates that the box contains "100 No. 1 BLANK CARTRIDGES CRIMPED FOR SAFETY PISTOLS AND REVOLVERS."

When asked if live ammunition can be used in these pistols, the witness stated "If you put a live bullet in the cylinder and it's ignited by the hammer, the bullet will go into the barrel. That's the usual procedure. However, since the hole of the barrel is too small to let the projectile pass through it would explode in your hand. And therefore that's dangerous." He further testified that the pistol is not calibrated to fit any particular size ammunition; that there are no live cartridges of the same caliber as the bore of the gun. Said the witness, the caliber is smaller "Than any commercial cartridge made at present or any cartridge, for that matter." He also stated that the cartridge is loaded with powder only.

Rose testified that while the bores of regular revolvers which shoot live ammunition must be rifled to secure accuracy in shooting, the bore of the RG–8 starter pistol is not rifled. He knew of no firearms which are not rifled, with the exception of shotguns and cap-and-ball pistols.

On cross-examination, Rose stated that he sells articles like exhibit 1 all over the country for use at sporting events.

Defendant's witness Dewayne A. Wolfer testified that he was a firearms identification expert for the Los Angeles Police Department, City of Los Angeles, Calif., having been employed in the crime laboratory since 1951. He stated that he had tested pistols and revolvers and related firearms "Every day" for various purposes. "* * * sometimes to determine the projectiles which were fired from them, the same revolvers or the same pistols, to identify cartridges and shells, to do such things as experimental work with them to deter-

mine if they are capable of hurling projectiles, and muzzle velocities. General firearms work of all nature."

Wolfer also testified that his laboratory had "done a series of experiments which lasted for several weeks with similar exhibits as Exhibit 1 here." These tests consisted of "* * * running on them penetration tests by firing different types of projectiles through them and firing them into pine boards to determine their penetrating ability. We took these revolvers and determined their penetrating ability. We took these revolvers and determined the type of projectile that might be fired through the weapons, and similar related tests."

He further stated that "These weapons can have projectiles, to come under the firearms definition, fire through them in two manners." He admitted that they did not have a rifled barrel, stating that rifling is only necessary for the firing of an elongated projectile. He noted that exhibit 1 was marked ".22" caliber and that it would chamber a 0.22 round of ammunition; that there is a constriction below 22/100 of an inch in exhibit 1 between the cylinder and the head of the barrel. In testifying that a projectile could be fired by an article like exhibit 1, he admitted that this can only be done by the use of the old-fashioned muzzle-loading type of ammunition; that if blank or standard 0.22 ammunition were used, it would have to be whittled down in order to pass freely through the starter pistol, or extruded in a long form of lead.

Wolfer also testified that a gun would normally have a proper size of ammunition designed for it, but that there is no live ammunition specifically designed to be fired through the barrel of the starter pistols in controversy.

Although Wolfer testified that exhibit 3, the 0.22 caliber ammunition, could be fired through the RG–8 starter pistols, he could not say that he had ever used that type of ammunition in articles like exhibit 1.

Based upon the testimony of the witness Rose, plaintiff contends that the importation under consideration can not properly be classified either as pistols or revolvers within the meaning of those terms, as used in paragraph 366 of the Tariff Act of 1930, *supra*. In support of this contention, plaintiff invites our attention to the decisions of this court in *S. E. Laszlo* v. *United States*, 1 Cust. Ct. 209, C.D. 47, and *F. W. Myers & Co., Inc.* v. *United States*, 21 Cust. Ct. 145, C.D. 1145.

The *Laszlo* case related to certain air-pistols and so-called pistolets and parts thereof which had been classified as articles in chief value of metal in paragraph 397 of the Tariff Act of 1930, but were held to be properly classifiable as machines and parts thereof in paragraph 372 of said act. It appears from the opinion of the court, in that case, that the air-pistols were represented by exhibits 1 and 2

and the pistolets by exhibit 3. Exhibit 3 was described as an imitation revolver, "except that the muzzle is solid so that a bullet can not pass through it," being so manufactured that only blank cartridges could be used.

Before reaching its conclusion in the *Laszlo* case that the articles should be classified as machines, the court deemed it important that consideration be given to the question whether the articles might not be specifically provided for in paragraph 366 of said act as pistols or revolvers. To quote from the opinion of the court—

* * * The mere fact that they shoot bullets or pellets by the force of air instead of by explosion of gun powder would not necessarily make them any the less pistols. Also, the articles invoiced as pistolets resemble double action revolvers, except that they shoot blank cartridges, and they are admittedly used as revolvers on the stage and for starting races and the like.

The court then cited numerous definitions of the words "pistol," "revolver," "air-gun," and "firearm," and concluded from these definitions that the air-pistols there in controversy were not firearms and, consequently, were not pistols within the common meaning of that term. With respect to the pistolets, the court observed that they "* * * seem to answer the definitions of revolvers insofar as they are firearms; but they fail to meet the requirement of ejecting a projectile since they can only be used to fire blank cartridges."

Although the question whether the articles in the *Laszlo* case should be classified as pistols or revolvers was not in issue in that case and the discussion thereon may be treated as *dictum*, nevertheless, the reasoning of the court upon that matter has some bearing upon the present controversy.

The testimony of the importer Rose is very positive that the subject articles consisting of starter pistols or revolvers which are used to "start games," for "magic purposes," for "magicians," and "theatrical purposes," employ a blank cartridge of the kind illustrated by exhibit 2; and that if one attempted to use a live bullet in the cylinder "* * * the hole of the barrel is too small to let the projectile pass through [and] it would explode in your hand." Moreover, the pistol in controversy is not calibrated for use with any particular size ammunition, and there are no live cartridges of the same caliber as the bore of the pistols in controversy.

In our opinion, the testimony of defendant's witness Wolfer does not successfully refute the testimony of Rose. Wolfer had never used an article exactly like exhibit 1, and his testimony that it *could be* used to fire a projectile is qualified by his statement that it could only be done by use of the old-fashioned muzzle-loading type of ammunition, and that if blank or standard 0.22 ammunition were used they would have to be "whittled down" in order to pass freely through the starter pistol.

Exhibit 1 is so constructed that when in operation the trigger is pulled back, energy is stored in a spring within the handle and, at the same time, the cylinder containing blank cartridges revolves to a point where, upon releasing the trigger, it strikes and explodes a blank cartridge. The article, therefore, meets the requirements of what constitutes a machine, as indicated in *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T.D. 37537, and the numerous decisions which have been rendered following that case.

The *Myers* case, *supra*, cited by plaintiff, related to what was described as the "Cash X" captive bolt humane cattle killer. While the article was similar in appearance to an ordinary pistol, the barrel contained a sliding pole-axed rod or captive bolt which was free to move to and fro but could not leave the barrel. By the explosion of a small but powerful blank cartridge, the bolt was driven into an animal's head. The bolt was then instantly and automatically withdrawn into the barrel of the pistol by the force of compressed air in the cylinder. We there held that the "Cash X" cattle killer was not a firearm, since it did not eject a missile or projectile, citing the *Lazlo* case, *supra*. The article was, accordingly, held properly classifiable as a machine.

Applying the principles of the *Laszlo* and *Myers* cases, *supra*, we find and hold upon the record before us that the subject merchandise herein is not classifiable as pistols or revolvers in a tariff sense, but is within the provision for machines, not specially provided for, in paragraph 372, *supra*, as judicially construed, as claimed by the importer.

The protest is sustained and judgment will issue in accordance with the views above expressed.